The argument is 20-1328, Eli Lilly v. Apotex. Mr. Mercosi. Thank you, Chief Judge. May it please the Court, William Mercosi for Appellant Apotex. The Court should reverse the judgment of infringement. Three times, Lilly made narrowing amendments from the broad Olenta claim term to the disodium salt term. Each one indisputably was made for substantial reasons related to patentability. Each gave rise to the festo presumption of surrender of all territory between the broad Olenta claim and the narrow salt claim. And on this record, Lilly cannot rebut the presumption of surrender of the well-known dipotassium salt. By the way, I'm sorry, go ahead, Chief Judge. Thank you. This is to Sharon Proce. Isn't it clear that the, you know, and Lilly outlined this in her brief, and I think the district court judge relied on it, that the changes made by Lilly were for this provision in the MPEP that deals with trademarks or trade names being used? Isn't that all over the prosecution history as the basis for which Lilly made the change? Actually, two responses to that, Your Honor. First off, for context, obviously if we're talking about tangentiality now, now we've made the determination that there's been a narrowing amendment that surrenders the other salt. But having said that, Your Honor, that's not the reason that Lilly actually gave in this record in the January 2005 amendment. Well, let me back up a second. For two amendments, Your Honor, remember there were three here. For two, in November 2005 and July 2007, Lilly did not give any reason for the amendment. And as we know, each amendment can independently give rise to the federal presumption of surrender, and silence can't rebut the surrender. But for the January 2005 amendment, what's key here is that Lilly didn't just amend to get rid of the trade name. What Lilly told the examiner was that they were canceling the Olenta terms without prejudice to move the rejection. And that's key because Lilly has signified and agreed that when you say without prejudice, you actually are saying you don't agree with the examiner's indefiniteness and improper trade name rejection, and you are reserving the right to go after that argument in broader claim scope later. That's a familiar pattern in prosecution we see where an applicant like Lilly narrows the broad pemetrexate claim to the disodium salt to achieve allowance, but reserves the right to go after broader claim scope later. And that's exactly what happened here. And in the November 2005 amendment, they actually amended from Olenta to a claim that said both pemetrexate disodium and pemetrexate, indicating their objective intent to go after other salts. It's even more explicit in the foreign counterpart, which is based on the exact same PCT, the same specification, and the same Olenta claim language. When the examiner rejected Olenta is unclear, Lilly amended it to mean pemetrexate. And even more critically, they told the EPA examiner the basis for that was the same two parentheticals that they now rely on for this court as supposed definitions for pemetrexate disodium. But in the foreign counterpart, they said the exact opposite. They said those parentheticals were actually support for Olenta to mean pemetrexate. So we submit there's nothing tangential here, and Lilly has not provided a rationale that would suggest the well-known dipotassium salt is tangential. Let me ask you, if I could, Mr. Acosta, you've mentioned now twice the salt that Apotex uses. Throughout the briefs, you've marked that as confidential, and I wondered why it's confidential. Are you maintaining confidentiality with respect to that other salt that Apotex uses or not? We are not any longer. The reason that we initially sealed it is because it had not been disclosed to the public up until then. But let me ask you then, you mentioned the two references, but they look very definitional to me, and they have been in the application since they were first filed where the applicant says pemetrexate disodium parenthesis Olenta. And that appears twice. Why isn't that clear definitional language that identifies Olenta, regardless of what may have been done or said in the European application, for purposes of the U.S. application and the U.S. prosecution, why doesn't that establish that we now know exactly what Olenta is for all purposes relevant to this patent?  First off, there's no authority that a parenthetical alone is a definition, and Lilly has never taken that position. Well, it's not technically a definition, but it's so close to being a definition that to me it has definitional impact. I can't see how one could argue that Olenta to the patent drafter, the application drafter, meant anything other than pemetrexate disodium. The problem with that, Your Honor, is that it ignores the rest of the intrinsic evidence in the specification itself. We can look at the claim term Olenta. The claim 9 said wherein the antifolate is Olenta. Antifolate is defined in that very same paragraph with one of those parentheticals to mean the chemical compound that inhibits the enzymes. All parties agree that is only pemetrexate. Even Lilly has admitted that it's pemetrexate that targets the enzymes. Pemetrexate is the antifolate as defined in the specification. So, at most, Your Honor, that parenthetical, which resides in that same definitional paragraph of antifolate, which must mean pemetrexate, is nothing more than an association with pemetrexate disodium, as the language indicates, the most preferred example that contains the antifolate Olenta or pemetrexate. But then we go on to the rest of the specification, Your Honor. And while we have those two isolated parentheticals, we have over 28 different uses in the specification method section where Olenta is not just associated with pemetrexate. It actually means pemetrexate. And I'm referring to every administration and dosing reference of Olenta. We know from the specification and the she references cited in the specification that that means pemetrexate. But perhaps most critically, Your Honor, to your question, you can go to the specification and you can see where Olenta is used interchangeably with the term MTA. MTA is an acronym for multi-targeted antifolate. And we know from the prior art, including the she references cited in the specification, MTA is pemetrexate. There's nothing indirect or transitive about the name MTA. It is pemetrexate. And the specification uses Olenta interchangeably with MTA in the human clinical trials portion of the specification. So we would submit that those are not definitions. The case law doesn't support the fact they're definitions. We never told any examiner in the U.S. or the foreign counterpart that those were definitions for pemetrexate disodium. In fact, they told the EP examiner just the opposite, that those were support for Olenta to mean pemetrexate. We can also go on to the rest of the prosecution history record, Your Honor, including the Olenta package insert that Lilly made of record. So it's now intrinsic evidence. There's no dispute that dozens of references in that package insert all, in fact, show that Olenta is being used to mean pemetrexate. The clinical trials, the mechanism of action, the dosing administration, all are using Olenta to mean pemetrexate. And finally, Your Honor, the literature also indicates that skilled persons use Olenta to mean pemetrexate. Both in the prior art, such as the Van Treest reference, but also later references like Schultz and Adjaye. Dr. Schultz and Lilly scientists, when reading the Taylor, Calvert, and She prior art, reasonably interpreted Olenta to mean pemetrexate. So the totality of the evidence we submit, Judge Bryson, shows that those two parentheticals are not definitions, and that the intrinsic record and the intrinsic evidence show that skilled persons use Olenta to mean pemetrexate. And even if you go to those two parentheticals, you can see the paragraphs they're found in. One is in the prior art paragraph. One is found in the anti-folate definition paragraph. And it's undisputed that when we're talking about the prior art anti-folate, the inhibitor, that means pemetrexate, not pemetrexate disodium. Lastly, I would just like to say a brief word. You mentioned the label. At least one copy of the label, it seems to me, appears in Appendix 7640, right? Is that right? Yes. One copy does, and a highlighted copy is at A904. Right. Well, I'm looking at the one at 7640. At the top, on the left-hand side, the very beginning of the label, it says Olenta, pemetrexate disodium. Yes. That's the definition of Olenta. And so it's not true, is it, that the label is entirely in terms of just pemetrexate as being Olenta? No, it is true, Your Honor. The label does associate Olenta with pemetrexate disodium in that one portion. But if we turn the page and we continue through all the other sections, administration, dosages, clinical trials, warnings, mechanism of action, and pharmacokinetics, Your Honor, there's no dispute here that Olenta is being used to mean pemetrexate in all of those other sections. And pemetrexate, I gather, is just the anion of the salt, right? And it dissociates in solution from the sodium. That's correct, Your Honor. Pemetrexate is neutralized form. And it's the anion that is the operative active ingredient of the compound, right? It's correct, Your Honor. It is actually, and just very briefly, I know my time is up. I want to save some for rebuttal. But, yes, pemetrexate is the only active ingredient. It's the only thing that actually inhibits the enzymes that acts as the antifolate. Pemetrexate disodium doesn't do anything. It doesn't cause toxicity. It doesn't act as an enzyme inhibitor. In fact, it really has conceded as much. And their own expert has admitted that disodium and dipotassium are not different antifolates. They are both different salt forms of the exact same antifolate, pemetrexate. With that, Your Honor, I would like to reserve rebuttal time unless you have any other questions. You will get your rebuttal time. This is Judge Prost. But this is just a tangential housekeeping. I'm sorry to use the word tangential. This is just a housekeeping matter, which is the district court concluded that you conceded infringement under DOE unless this prosecution history estoppel applies. And I didn't see anything that suggests that you were contesting that conclusion. So I just wanted to be clear. We were not and did not contest equivalence under the function way result test, Your Honor. Our position was that the doctrine of equivalence was barred entirely by estoppel. Thank you. Thank you. We'll reserve your rebuttal. Let's hear from Mr. Perlman. Thank you. Thank you, Your Honor. Good morning, Your Honor. May it please the court. There was no narrowing amendment in this case. As Judge Bryson pointed out, the specification makes clear twice that Olympta is being used as the trade name for Pemetrexid disodium. And when Lilly replaced Olympta in the claim in response to a rejection that it had improperly used the trade name in the claim, it replaced it with Pemetrexid disodium, which is the generic name for the identical thing. Mr. Perlman, let me just interrupt you briefly because your friend's response, among his responses that I understood to my question about that was that, well, you said without prejudice. And that somehow meant that you were reserving the right to do et cetera, et cetera. Do you have a comment about explaining this without prejudice thing? I absolutely do, Your Honor. I think that Mr. Riccosi respectfully is reading too much into the phrase without prejudice. The question for tangentiality is what is the reason that we did what we did? The reason was to eliminate the trade name. Saying without prejudice just means, well, we're not saying we agree with you, but we're doing it anyway. And so if you look to why did we do it, that is what the file indicates as to why we do it, why we did it. And that is tangential. And the evidence on tangentiality is one-sided. They have no one who provides testimony. We have our expert who read it through the eyes of a skilled person. But just looking at the file history, it's elusively clear that the issue here was the use of a trade name. To get back to something Mr. Riccosi said about the specification and about column four and the definition of antifolate and it being focused on the active form. If you look at column four, what it makes clear is that not only the active form can be called an antifolate. Because it says hematrexid disodium parenthesis olympia is the most preferred antifolate. And so, yes, the beginning of the paragraph says that antifolate is defined based on the entity that inhibits the enzymes. But it goes on to say in the exact same paragraph that hematrexid disodium is the most preferred antifolate. And so when Lilly's original claim said wherein the antifolate is olympia, that is entirely consistent with claiming the most preferred embodiment of the antifolate, hematrexid disodium. As to the point of what our expert said or what we've previously said, it's important to remember that the context of that discussion in the Hospiro case was something entirely different. The issue in that case was how did the applicant distinguish the prior art and it was distinguished based on the identity of the active antifolate. And that was the context in which this definition came up. It has nothing to do with the issue in this case. And the other thing I will point out is that the entire premise of the Hospiro decision from this court from last year where, by the way, this court twice noted that the original claims we're talking about here were limited to hematrexid disodium. The entire premise was that we had narrowed within the original scope of the claim when narrowing from antifolate to hematrexid disodium. And so of course hematrexid disodium is an antifolate. Mr. Riccosi mentioned three narrowing amendments. In fact, there's one narrowing amendment here. In 2005, we canceled the claims to the trade name Olympta, rendered that moot, and proceeded to narrow the antifolate claims to claim hematrexid disodium. On two subsequent occasions when we started new applications in the same chain, we filed preliminary amendments where we had to re-cancel the same claims. Because that is just the nature of how a preliminary amendment works. Let me make sure I understand what you just said, Mr. Parman. Did you say that you actually narrowed the claims when you went from Olympta to hematrexid disodium? No, no, no, no. I believe that's, well, the recording will confirm or deny. But I thought I heard you say you only narrowed once when you went from Olympta to hematrexid disodium, which came as a surprise to me. No, no, no. If I said that, I apologize. All right. No, no. We canceled the claims once. We went from Olympta to hematrexid disodium. And what I intended to say is at the same time we narrowed from antifolate to hematrexid disodium. All right, all right. I appreciate that. No, I'm joking. As to the issue of whether we tried to claim hematrexid in the November 2005 preliminary amendment, we did not. That claim is limited to the use of hematrexid disodium. It recites a method of inhibiting tumor growth by administering hematrexid disodium. Later in the claim, it refers to giving a methylmalonic acid lowering agent prior to the first administration of hematrexid. But that is obviously referring back to the previously stated hematrexid disodium because that is the antecedent basis for that term hematrexid. It's clearly a typographical error, which the examiner noted. The more important point is that that amendment has nothing to do with the issue in this case. That amendment is about the issue in the Hospira case, which was narrowing antifolate to hematrexid disodium. All of the action of canceling the Olympta claim to remove the trade name had happened in the previous application. And I'll just point out parenthetically, I don't know that it goes anywhere, but on Mr. Riccosi's theory, it wouldn't even be a narrowing because he says Olympta means hematrexid, and he says the amended claim says hematrexid. And so the entire thing to me is a tempest in a teapot. Now, as to the- Can I ask you, while you're moving on, can I ask you what, in your view, is the particular compound or portion of a compound identified as LY231514? So the prior art uses that to mean both hematrexid and hematrexid disodium. Right. For instance, the John reference that was before the examiner refers to hematrexid disodium LY231514, and the examiner says also known by the trade name Olympta. Right. And the same is true of MTA, which was the point I was about to get to. Mr. Riccosi says MTA and Olympta were used interchangeably, and MTA can only mean hematrexid. But it's your position that LY231514 is hematrexid disodium, not simply hematrexid. It has been used to mean both. But you would say- Do I understand you to be saying that colloquially, because it doesn't really matter what the particular cation is, that colloquially this is referred to as either hematrexid or hematrexid disodium, but it actually technically means hematrexid disodium? Is that your point? I don't think that is my point, Your Honor. Okay. I think right up until the last part, that was my point. There are various references to this LY231514 in the record that identify that as hematrexid, and I'm wondering what your position is with respect to those. Are they simply erroneous, or are they kind of a loose characterization of the portion of the compound that really matters? The thing that is loose about it is that the association of that with olympta, and then the suggestion that that means that because 231514 can mean hematrexid, that olympta must necessarily mean hematrexid. There is frankly not a clear answer in the record about what the right answer is. That code was used in the prior art and by Lilly to refer to both the hematrexid disodium and to hematrexid per se, but the point here is that whether or not that term or MTA has been used to refer to either substance, olympta is the trade name for an actual product as manufactured by Lilly, as the specification says, and that product always is hematrexid disodium, and that answers the point about MTA's usage in the specification. MTA is used to mean hematrexid disodium, just as olympta is, and it is undisputed that in the clinical trials where MTA is discussed, their own expert admitted the person of ordinary skill would know that the only substance ever given to human patients was hematrexid disodium, and so that has to be what MTA means in that context, and let me just say something more broadly about the literature that Judge Bryson brought up. It's important to remember that the authors of these papers were not engaged in the somewhat Talmudic dissection of the terminology that we are engaged in in this case. They were talking about a new and exciting chemotherapy drug, and when they talk about the word hematrexid, sometimes they put olympta in parentheses. That's because the only way anywhere in the world any doctor could find a product that has hematrexid in it, if they were interested, would be to look to olympta. It doesn't change what the olympta product is. It doesn't change that olympta is the trade name for hematrexid disodium products, because the context in which these articles are being written is not the same context that we are engaged in in this case, but my principal point is none of that makes any difference. Look to the intrinsic record here. The specification is clear that olympta and hematrexid disodium are meant to be the same thing, and the examiner three times in the very office action that we are focused on here made clear that he or she understood that olympta is the trade name for hematrexid disodium. In rejecting over the John reference, the examiner expressly said that olympta is the trade name for hematrexid disodium, and then there's a rejection of claims 9, 29, and 30 where the claims said olympta, and the examiner characterized the claims as specifically citing hematrexid disodium, which, by the way, is what this court did in Hospiro. And then there's a second rejection of claims 29, 30, and 33 where the claims said olympta, and the examiner said those claims specifically cite hematrexid disodium. And so three times in the very office action that we are focused on, the examiner made clear that which is also clear from the specification, that olympta means hematrexid disodium. I want to say a quick word about the European application, because it's actually supportive of our position, not Apotex's position. Mr. Riccosi said that the examiner in Europe objected to the use of the word olympta, and we replaced that word with hematrexid, but that isn't the entire story. First of all, we did not say that we were equating olympta and hematrexid. What the European attorney said is that having disclosed hematrexid disodium under European law, he felt he should be entitled to claim hematrexid per se, that under European law that would be a sufficient disclosure and basis. That issue has nothing to do with any issue in this country or in this case. The next thing that happened, though, is that the examiner said, no, you don't have that basis. You've disclosed olympta and hematrexid disodium, which are different than just hematrexid. And so you cannot claim just hematrexid, because your specification in disclosing olympta is only disclosing hematrexid disodium, which is a different compound. And so Lilly then changed its claims again and said, we are now claiming our preferred embodiment, hematrexid disodium, parenthesis olympta, and we are going to go through, because this is the practice in Europe apparently, we are going to go through the specification and replace all instances of the word olympta with the word hematrexid disodium, and we'll put olympta in parenthesis. Absolutely consistent with our position in this case. In my short time remaining, I want to turn briefly to tangentiality. The question for whether there was a narrowing is something that this court looked at as of today and said, looking back, objectively was there a narrowing? The question on tangentiality is what actually happened at the time in the file history, and what can we glean from the objective review of that file as to what the rationale was at the time for the amendment? And this file history makes crystal clear that the reason for this amendment was to remove the trade name from the claim and to moot that rejection. There was no substantive issue with the scope of this claim. Hematrexid disodium was known in the prior art, and as this court pointed out in Hospira, it makes no sense to say that you would amend to hematrexid disodium to avoid prior art that discloses hematrexid disodium. The reason in the file is to avoid the trade name, and in the two subsequent preliminary amendments where the amendment is carried forward, it is the same reason carried forward again. And this court, in every tangentiality case, faces preliminary amendments where all the action has happened in the past and the same amendment is carried forward. And what Mr. Riccosi is saying is, well, you have to repeat all your arguments and all the substance again every time you file a preliminary amendment or else it's an unexplained amendment. That wasn't the law in Hospira when two other parties made that exact argument a year ago. It has not been the law in any of these courts' cases. And I thank the courts. The district court should be affirmed. Thank you. Mr. Riccosi, we'll restore your five minutes of rebuttal whenever you're ready. Thank you, Chief Judge. Several points. First, we agree the intrinsic evidence should control here. In here, Claim 9 was directed to the anti-folate Olenta. Olenta was the anti-folate. There's no dispute the anti-folate is defined as the inhibitor, and Lilly has admitted that the inhibitor is pemetrexid. It is pemetrexid, not the salt, that does the inhibiting. That is the, quote, anti-folate, end quote, as defined in the specification. And I'm not sure why Lilly should build a runaway from admission from the Hospira case about what the anti-folate is. Point two, to your question, Judge Bryson, on LY231514, I don't want to belabor the point, but we can start with prior going back to 95, whether it's Jackman, She, 97, 98, Calvert, 98, Rizola, 98, Calvert, 99. These all use and define LY231514 as pemetrexid, as an actual compound inhibitor, pemetrexid. As a matter of fact, the examiner recognized this much in Rizola, 1998, which also uses LY231514 and MTA to be actual pemetrexid, the inhibitor that undergoes that intracellular polyglutamation. It is not the salt. And if we look at what the examiner said about Rizola, she associated LY231514 followed by a parenthetical to Olympda. So she even understood what LY231514 was. And when she was talking about John, if you look carefully on A7401, she puts the parenthetical, also known by the trade name Olympda, after LY231514. And again, all of the prior art references make clear that that is pemetrexid. As a matter of fact, Rizola, 1998, even goes out of its way to make clear and distinguish LY231514 from the salt, saying that a salt form of LY231514 was also made. And so when the specification says or uses interchangeably the terms Olympda and MTA, it is using Olympda interchangeably with pemetrexid. Point three, on the European counterpart, we're talking about the same specification, the same PCT application that it claims priority to, the same claim language, and an examiner who found Olympda unclear as well. They amended the pemetrexid and then told the examiner the basis was those parentheticals. Now, the only reason LY later amended was because the examiner would not allow them to claim so broadly as to capture the other salts. When they made the amendment from Olympda to pemetrexid, they dropped in a dependent claim where pemetrexid is pemetrexid disodium, showing the world they were attempting to capture other salts. Only when the examiner did not allow them to do that did they then go back to the U.S. language, pemetrexid disodium, and make those changes. So we submit the EU counterpart or the EPO counterpart is real-world pre-litigation objective evidence of what Lillian skilled persons believed Olympda to mean pemetrexid, and that Lillian, by those amendments, was attempting to capture other salts. Point four, on these amendments, there's no dispute in this record. There were three amendments made here amending the Olympda claim term. Each amendment, whether it was... Well, there was one amendment that was carried over to the two provisionals, right? Bob, there was the original November 2005, Your Honor, and then a November 2005... And that carried over to two provisional applications, right? Well, when you say carry over, Your Honor, meaning that they started with the same claims and then amended them, I would agree with that, yes. But I would not agree that the reasons for those amendments carried over. We see no authority cited by Lillian in the papers at all for this idea somehow that their trade name theory in the November 2005 amendments somehow automatically carries over to the other two amendments. The law is when you don't give a rationale, that's silence. Silence cannot rebut the thefto presumption of surrender. And on the November 2005 amendments, again, they didn't say we were amending to get rid of the trade name. They said the opposite. They said we are deleting without prejudice. When you say that, that means you're reserving the right to go after that broader claims scope, which is exactly what they tried to do both in the U.S. and Europe, signaling their intent to try and capture other salts. And the dipotassium salt is the second most well-known salt. It falls right in the bullseye of that surrender. In this case, it's nothing like Hospira. My final point, the Hospira court did not make a finding on Olinta. It did not have the record or the occasion to do so. It involved a different term, a different rejection, and different amendments and rationales, and there's nothing tangential about repeatedly narrowing from Pemetrexid covering all salts to the disodium. So really it's not shown that a skilled person would not be reasonably expected to draft a claim that literally encompasses the well-known dipotassium salt. Thank you, Your Honor. Thank you, and we thank both sides. The case is submitted, and that concludes our proceeding for this morning. Thank you all. The Honorable Court is adjourned until tomorrow morning at 10 a.m.